***********
Pursuant to the August 18, 2009 Opinion of the Court of Appeals in this case, the Full Commission finds as fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
(1) All parties are properly before the Commission, and the Commission has jurisdiction of the parties and the subject matter.
(2) Employee is Merlin Hawkins. *Page 2 
(3) Employer is General Electric Company.
(4) The carrier on the risk at the time of the alleged injuries was Electric Insurance Company.
(5) Defendant-Employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act. The employer-employee relationship existed between the employer and the employee on April 20, 2005, the first date that the plaintiff was disabled as a result of the alleged occupational disease.
(6) The parties have stipulated to an average weekly wage of $1,058.71, which yields the maximum compensation rate for 2005 of $704.00.
(7) A notebook containing the following was admitted as Stipulated Exhibit 1:
 (a) Triangle Family Practice, medical records.
 (b) Triangle Dermatology Associates, medical records.
 (c) Dr. Peter Bressler, medical records.
 (d) Central Dermatology Center, medical records.
 (e) Dr. Elizabeth Sherertz, medical records.
 (f) Dr. Beth Goldstein, medical records.
 (g) Duke University Medical Center, medical records.
 (h) Concentra Medical Centers, medical records.
 (i) Industrial Commission Forms 18, 19, 33, 33R, 61.
 (j) Plaintiff's discovery responses.
 (k) Defendant's discovery responses including exhibits.
(8) The pretrial agreement dated February 2, 2007 was marked as Stipulated Exhibit 2 and made part of the record herein. *Page 3 
(9) Plaintiff's Exhibits entered into evidence include the following (Plaintiff Exhibits 1 — 6 are photographs of plaintiff):
 (a) Plaintiff Exhibit#1 — photograph of plaintiff's rear thighs and lower legs — sores and eruptions on his skin
 (b) Plaintiff Exhibit #2 — lower right leg and foot with blisters, sores, eruptions
 (c) Plaintiff Exhibit #3 — right side of stomach with right arm with blisters and sores
 (d) Plaintiff Exhibit #4 — back; rear left side — blisters and sores
 (e) Plaintiff Exhibit #5 — frontal view of left side of left arm and stomach area with blisters
 (f) Plaintiff Exhibit #6 — front view of both legs from thigh area and down with blisters and sores
 (g) Plaintiff Exhibit #7 — OSHA printout for zinc chromate; 0.001mg is equivalent to 1 microgram
 (h) Plaintiff's Exhibit #8 — zinc chromate report
(10) Defendants' Exhibits entered into evidence include the following (Defendant Exhibits 1 — 9 are photographs):
 (a) Defendant Exhibit #1 — photograph of turbines
 (b) Defendant Exhibit #2 — compressor area with a compressor on it
 (c) Defendant Exhibit #3 — compressor balance area with balancing machine with compressor on it
 (d) Defendant Exhibit #4 — stator build area for CF-6 engine; with housing on it *Page 4 
 (e) Defendant Exhibit #5 — vertical pit where engine is assembled in this area
 (f) Defendant Exhibit #6 — vertical pit showing various tools used in the assembly area
 (g) Defendant Exhibit #7 — Danobat grinder (new as of 2003)
 (h) Defendant Exhibit #8 — horizontal build area for engine assembly
 (i) Defendant Exhibit #9 — CFM engine horizontal area
 (j) Defendant Exhibit #10 — repair procedure
 (k) Defendant Exhibit #11 — December 2005 individual hygiene results
 *********** RULINGS
Defendants' Amended Assignments of Error submitted in supplementation of its Form 44, Application for Review, is allowed. Rule 801
The objections raised by counsel at the depositions taken in this matter are ruled upon in accordance with the law and the opinion in this Opinion and Award.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, Plaintiff was sixty-four years old. He is married with four adult children.
2. Following his graduation from high school in Roanoke Rapids, North Carolina in 1959, plaintiff joined the Navy where he was trained as an aircraft engine mechanic. Following his discharge from the Navy, plaintiff began work for Pan-American World Airways in 1963. *Page 5 
Plaintiff worked for Pan-American for 29 years until the company filed bankruptcy and went out of business. While working at Pan-American, plaintiff worked his way up through the ranks starting at aircraft cleaner and then mechanic's helper, mechanic, aircraft maintenance supervisor, shift manager, maintenance manager, and eventually director of aircraft maintenance.
3. After leaving Pan-American in 1992, plaintiff started working for Kiwi International Airlines where he was director of maintenance from 1992 to 1995. From 1995 to 1996, plaintiff was a maintenance controller for Atlas Airlines, and from 1996 to 1998, he worked as the manager of aircraft maintenance for Northwest Airlines at two airports in New York City.
4. In July 1998, plaintiff left Northwest Airlines in order to move back home to North Carolina. On September 28, 1998, he began work at the General Electric Aircraft Engine Manufacturing facility in Durham, North Carolina. During the entire time plaintiff worked at the defendant's manufacturing facility, he was an assembly and test technician working exclusively on the CF-6 engine. He worked primarily in the compressor and fan-build areas.
5. Prior to beginning work at the General Electric plant, plaintiff had never had any skin or breathing problems. He had only "very sparingly" worked with zinc chromate before working at that plant. He had never worked with isocyanates, acrylates, amines, nickel compounds, RTV sealing compounds, Epikure curing agents, epoxy resins, Dykem remover, thinner and cleaner, or Dykem steel blue layout fluid. Plaintiff had previously worked with graphite greases and oils. While working at the General Electric plant, plaintiff worked with these compounds daily. However, plaintiff did not often work with the Dykem steel blue layout fluid, the Epikure curing agents or the epoxy resin.
6. From the time plaintiff began work at the General Electric plant in September *Page 6 
1998 until sometime in 2003 or 2004, the grinder used at the plant to grind compressors and turbines was an old Butler Newall grinder. The old grinder emitted an excessive amount of dust-grind into the air around it to be breathed in by the plaintiff and other employees. Sometime in 2003 or 2004, defendant-employer bought a new Danobat grinder that was much better at eliminating the dust-grind and debris from the air. The dust-grind contained titanium, steel, and epoxy. While plaintiff was working as an assembly and test technician, he was required to use the grinder approximately twice per week. Even when he was not working directly on the Butler Newall grinder, plaintiff's work stations were often within ten feet of the grinder.
7. Plaintiff's job required him to heat materials that had been previously coated with various substances.
8. Defendants provided pictures of several areas of where plaintiff had worked, but there was no picture provided for the fan-build area where he spent approximately 50 percent of his time. Although plaintiff admits that the area in which he worked at the General Electric plant was relatively clean, it was not as meticulously clean as it appears in the pictures provided by the defendants.
10. While plaintiff was able to keep many of the compounds he used off his hands by the use of nitrile gloves, these compounds produced strong fumes that he breathed in while using them. Plaintiff breathed in fumes from these chemicals for a large portion of his average work day. He described these compounds and how they were utilized in significant detail. Plaintiff never utilized a respirator or any other kind of breathing protection.
11. Defendants provided material safety data sheets (MSDSs) for a number of the products to which plaintiff was exposed. Several of the MSDSs warn that the described product may cause sensitization dermatitis. They also warn, "Do not breathe vapors or mists." "May *Page 7 
cause skin sensitization." The manufacturers of Epon epoxy resin warn that their product "may cause skin sensitization." The manufacturer of Dykem remover and cleaner warns that "prolonged or repeated contact may cause skin sensitization or dermatitis." The manufacturer of Dykem steel blue layout fluid warns its users that "prolonged or repeated contact may cause skin sensitization or dermatitis."
12. Because the General Electric assembly plant is a huge, open building where air passes freely from one work station to another, plaintiff may have been exposed to fumes from chemicals that he was not even working with.
13. In the spring of 2003, plaintiff began to experience rashes and sores on his lower legs and hands that eventually began to ooze, itch severely and blister. He also developed a difficulty in breathing at about the same time. Even after the skin and breathing problems developed, plaintiff continued to work with the same chemicals.
14. Plaintiff first went to his primary care physician for his skin and breathing problems on June 18, 2003. His doctor found that he had persistent rashes on his lower legs with occasional small weepy papules. The doctor was uncertain as to what was causing these symptoms and referred him to a dermatologist. The next day plaintiff was examined by a dermatologist at Triangle Dermatology Associates who found sores on both ankles. The sores were itching and tender. Plaintiff returned to Triangle Dermatology on June 26, 2003 and July 10, 2003 with the same symptoms but with the apparently mistaken diagnosis of "nummular eczema." The symptoms were worsening. Plaintiff returned to Triangle Dermatology on August 1, 2003, September 10, 2003 and September 15, 2003. Twice the symptoms improved after "following courses of oral prednisone, an oral steroid." Following his last visit on October 8, 2003 in which his symptoms had continued to worsen, plaintiff was referred to Duke University *Page 8 
Medical Center.
15. On October 29, 2003, plaintiff was examined by a dermatology resident at Duke University Medical Center who took a thorough history and examination, but was unable to arrive at a diagnosis. However, when plaintiff returned on November 5, 2003, Dr. Russell Hall, a professor of medicine at Duke, made the diagnosis "allergic dermatitis of unknown etiology." Plaintiff saw Dr. Hall several more times until February 18, 2004 when Dr. Hall diagnosed non-specific pruritic spongiotic dermatitis. Although he reacted well to the Prednisone, the cause of the plaintiff's dermatitis continued to be unknown.
16. On March 2, 2004, plaintiff saw Dr. Peter Bressler, an allergist in Chapel Hill. Following an extensive examination, Dr. Bressler could not identify an obvious cause for the plaintiff's dermatitis. He did not believe that a skin test would be helpful, but he wondered whether the plaintiff's exposure to zinc chromate or RTV sealing compound at work might have been contributing to his rash.
17. Plaintiff continued to see Dr. Hall for dermatological treatment until May 19, 2005 when Dr. Hall diagnosed reactive dermatitis of uncertain etiology. As Dr. Hall felt that plaintiff's problems were likely caused by a reactive inflammatory process due to chronic non-specific irritation, he referred plaintiff to Dr. Darcy at Duke Occupational and Environmental Medicine.
18. On March 5, 2005, plaintiff was examined by Dr. Beth Goldstein at Central Dermatology Center. On April 5, 2005, Dr. Goldstein wrote a letter to plaintiff's primary care physician raising the possibility that his dermatitis was a result of occupational exposures.
19. On April 15, 2005, plaintiff was painting bolts and washers with zinc chromate when he experienced a severe burning and itching sensation over his entire body. *Page 9 
Simultaneously he had difficult time breathing. On April 20, 2005, Dr. Goldstein wrote plaintiff a note excusing him from work because, "occupational exposure seems very likely — especially zinc chromate — however he had a negative reactive to potassium dichromate on NACD battery."
20. Thereafter, Dr. Goldstein referred plaintiff to Dr. Elizabeth Sherertz, a board certified dermatologist who over the last twenty years has focused her practice on contact dermatitis and occupational dermatologist. In her practice, Dr. Sherertz has seen a substantial number of people with allergic reactions from chemical exposure.
21. Dr. Sherertz first saw plaintiff on April 25, 2005. In conjunction with the examination, Dr. Sherertz reviewed a substantial amount of plaintiff's prior medical records. The increased number of allergy defense cells in plaintiff's blood was suggestive of an allergic reaction. However, patch testing to standard allergens was negative. The fact that plaintiff was continuing to experience symptoms suggested that he was continuing to have some ongoing exposure-triggering reaction. It was significant to Dr. Sherertz that plaintiff used heat-set materials in his workplace. Heat-set materials often utilize acrylics, isocyanates or epoxies.
22. On examination, Dr. Sherertz noted multiple three-millimeter to twelve-millimeter crusted, raised blisters on plaintiff's chest, abdomen, back, suprapubic area, scrotum, upper arms, forearms, dorsal hands, and some of the fingers on both hands. Some of the blisters on his thighs, lower legs, and feet were still "juicy." Dr. Sherertz was concerned with what she saw in the examination as it indicated a fairly generalized reaction and "very, very inflamed skin." She was concerned that plaintiff was having a reaction to something coming in contact with his skin in a general way or possibly something being inhaled and triggering an allergic reaction. She felt that he was having a systemic reaction as opposed to a direct contact reaction. Dr. Sherertz then recommended allergic skin patch testing for specific chemical compounds. *Page 10 
23. Dr. Sherertz applied patch testing for various workplace chemicals on April 25, 2005 and removed them on April 27, 2005. On that date, Dr. Sherertz wrote "by history and clinical appearance, I am very suspicious that this is a work-related allergic contact dermatitis." Plaintiff had minimal inflammatory reactions to some chemicals, very faint evidence of reaction to other chemicals, and was negative to the remainder.
24. On May 20, 2005, Dr. Darcy took an extended history of plaintiff and examined him thoroughly. Dr. Darcy diagnosed a possible occupational contact/allergic dermatitis with an occupational allergic/irritant asthma component. Plaintiff had been out of work for approximately three and one-half weeks at that point. Dr. Darcy noted that three and one-half weeks was long enough to see some improvement but not long enough to determine if the work environment was playing a role in his skin and respiratory symptoms. Dr. Darcy also strongly recommended an autoimmune work-up by his primary care physician.
25. When plaintiff returned to Dr. Darcy on June 24, 2005, he noted a sharp reduction in the onset of new skin lesions and a healing of most of his residual lesions. Dr. Darcy noted that plaintiff's dramatic improvement was likely the result of his removal from the work place exposures and therefore recommended that he continue to avoid any chemical irritants and sensitizers and included a list of chemicals to avoid. He noted that plaintiff's autoimmune testing showed no abnormalities.
26. On July 6, 2005, Dr. Goldstein wrote plaintiff a note allowing him to return to work on July 15, 2005 if he could avoid exposure to a list of chemical compounds.
27. During plaintiff's 90-day period away from occupational exposures, his symptoms gradually disappeared completely.
28. Plaintiff returned to work on July 18, 2005. *Page 11 
29. When plaintiff returned to work on July 18, 2005, he worked primarily in the low pressure turbine area where he would not be working directly with the chemicals his doctors had prohibited. He worked approximately 20 to 30 feet from where the irritating chemicals were being used. Plaintiff could smell the chemicals being used 30 feet away from him.
30. Shortly after plaintiff returned to work on July 18, 2005, his symptoms gradually reappeared. Plaintiff remained at work until September 8, 2005 when his doctor wrote a note requiring him to avoid all exposure to the listed chemicals. Plaintiff has not returned to work at the General Electric plant since September 8, 2005.
31. On September 8, 2005, Dr. Goldstein wrote plaintiff a note stating that his dermatitis was occupationally related and that he should avoid exposure to any airborne or tactile contact with the noted chemicals. On September 21, 2005, Dr. Goldstein diagnosed "contact hypersensitivity syndrome."
32. Plaintiff returned to Dr. Sherertz on September 8, 2005. During his three month leave of absence, his skin had completely cleared up without the assistance of systemic Prednisone, an anti-inflammatory medicine. In Dr. Sherertz's note of September 8, 2005, she wrote that the patch test did not identify the probable causal agent of his occupational dermatitis for two reasons. Dr. Sherertz did not have the specific products from the work place with which she could test him and an inhalant allergy would not show up on patch testing because they are a different mechanism of exposure.
33. On September 8, 2005, Dr. Sherertz wrote, "Based on these findings, I think it is more likely than not that Mr. Hawkins has a work-related dermatitis. I make this conclusion based on a reasonable degree of medical certainty, given my experience in occupational skin disease." *Page 12 
34. On February 13, 2006, Dr. Goldstein noted that the plaintiff's "chromate hypersensitivity" was much improved. On May 22, 2006, Dr. Goldstein diagnosed "severe systemic hypersensitivity dermatitis with avoidance of work-place allergens."
35. Dr. Jeffrey Charles, a toxicologist, opined that no information provided to him demonstrated that any work exposure either by inhalation or skin contact has significantly contributed to the development of plaintiff's allergic contact dermatitis. Dr. Charles further opined that because there had been no other reported instances of allergic contact dermatitis at defendant-employer's plant, plaintiff must be a unique individual to have developed the condition.
36. Drs. Goldstein and Sherertz have a treatment history with plaintiff; therefore, the Full Commission gives greater weight to their opinions as to the cause of plaintiff's allergic contact dermatitis.
37. Plaintiff had not looked for work from September 8, 2005 until the time of the hearing before the Deputy Commissioner on February 7, 2007.
38. Stephen Carpenter is a Certified Rehabilitation Counselor, a Certified Disability Management Specialist, and a Certified Case Manager. Mr. Carpenter took a detailed work history from plaintiff. He found that when plaintiff moved to North Carolina in 1998, he had been unable to obtain a management position with the airlines because the airlines brought maintenance mechanics in from their home bases. He also found that management positions with the airline industry in the Triangle area required a college degree.
39. Mr. Carpenter administered various vocational tests on plaintiff. While plaintiff tested in the average range in many of the tests, his lack of education was apparent when he tested at the sixth grade level in spelling and seventh grade level in arithmetic. *Page 13 
40. Plaintiff demonstrated the ability to work at the medium physical demand level. However, given his advanced age, Mr. Carpenter recommended that safe work capacity be limited to the light physical demand level.
41. Plaintiff cannot return to aircraft engine assembly or maintenance management positions and he will be limited to seeking sedentary to light duty, unskilled to low level, semi-skilled jobs. With his limited education and limited experience outside this former industry, he will be searching for office helper, receptionist, retail trade, sales, security guard, food service, and cashier positions, etc. In these positions plaintiff will likely earn $6.15 to $9.00 per hour. Plaintiff was previously earning $55,229 per year.
42. In early April 2007, plaintiff called Mr. Carpenter to inform him that he was searching for a job. A list of the employers to which plaintiff applied was provided to Mr. Carpenter through plaintiff's attorney. Plaintiff applied to eight private employers as well as the State of North Carolina. He had also been visiting the web sites for the North Carolina Employment Security Commission, the State of North Carolina, Wake County, Durham County, The News and Observer, WRAL and worktriangle.com, daily searching for suitable job openings. Plaintiff had been rejected by all of the jobs to which he had applied.
43. Bernard Moore is a certified vocational counselor. Mr. Moore asserted that he had identified eight potential employment opportunities for which the plaintiff would qualify. The eight jobs are: automotive service writer, aircraft retail sales representative, electronic parts sales representative, maintenance mechanic supervisor, semi-conductors assembler, semi-conductor wafer processing inspector, automotive tools salesman, and electronics assembler. Mr. Moore opined that plaintiff would be able to transfer into other jobs that require management level experience. Mr. Moore further opined that there are job opportunities currently available *Page 14 
that would utilize the plaintiff's transferable skills. However, Mr. Moore did not identify any specific available jobs that could be verified.
44. Based on the greater weight of the evidence, the Full Commission finds that the job search plaintiff has performed is reasonable.
45. Based on the greater weight of the evidence, the Full Commission finds that plaintiff's work for defendant-employer was a significant factor in causing his systemic allergic contact dermatitis.
46. The Full Commission further finds that plaintiff's work for defendant-employer placed him at greater risk than the general public of contracting systemic allergic contact dermatitis.
47. However, the Full Commission finds that there is no competent evidence that plaintiff was placed at a greater risk of contracting asthma as a result of his work for defendant-employer than the general public not so employed.
48. Given the credible medical and vocational evidence of record, and as a result of his systemic allergic contact dermatitis, plaintiff has been unable to earn any wages in any employment from April 20, 2005 to July 18, 2005, and from September 8, 2005 to the present and continuing.
49. The Full Commission finds as fact that Dr. Goldstein, Dr. Sherertz and Dr. Bressler are the most appropriate physicians to continue care of the plaintiff's compensable disease of systemic allergic contact dermatitis.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 15 
 CONCLUSIONS OF LAW
1. In workers' compensation cases, plaintiff has the burden of proving every element of compensability. As part of this burden, plaintiff must present convincing evidence establishing these elements, including, in this case, expert medical testimony.Holly v. ACTS, Inc.,357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003); Harvey v. RaleighPolice Department, 96 N.C. App. 28, 35, 384. S.E.2d 549, 553, disc. rev. denied,325 N.C. 706, 388 S.E.2d 454 (1989).
2. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), plaintiff must prove that the disease is characteristic of individuals engaged in the particular trade or occupation in which the plaintiff was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and the plaintiff's employment. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tutlex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). Fann v. BurlingtonIndust., 59 N.C.App. 512, 296 S.E.2d 819 (1982); Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
3. Plaintiff has proven by the greater weight of the evidence that his employment with defendant-employer caused him to contract systemic allergic contact dermatitis. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tutlex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983), Fann v. BurlingtonIndust., 59 N.C.App. 512, 296 S.E.2d 819 (1982); Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
4. Plaintiff has proven by the greater weight of the evidence that his employment with defendant-employer placed him at greater risk than the *Page 16 
general public of contracting systemic allergic contact dermatitis. However, plaintiff has not proven by the greater weight of the evidence that his employment with defendant-employer placed him at greater risk than the general public of contracting asthma. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tutlex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983), Booker v. DukeMedical Center, 297 N.C. 458, 256 S.E.2d 189 (1979).
5. Given the credible medical and vocational evidence of record, and as a result of his compensable occupational disease, plaintiff is temporarily totally disabled and is entitled to compensation at the weekly rate of $704.00 from April 20, 2005 to July 18, 2005 and from September 8, 2005 to the present and continuing until plaintiff returns to work or further order of the Commission. N.C. Gen. Stat. § 97-29; Russell v. Lowes Prod. Distribution,108 N.C. App. 762 (1993).
6. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable occupational disease systemic allergic contact dermatitis as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, defendants shall pay temporary total disability compensation to plaintiff at the rate of $704.00 per week for the period of April 20, 2005 to July 18, 2005 and from September 8, 2005 to the present and continuing until plaintiff returns to work or further order of the Commission. All compensation that has accrued shall be paid in a lump sum.
2. The defendants shall pay for medical expenses incurred or to be incurred as a *Page 17 
result of the compensable occupational disease as may be reasonably required to affect a cure, provide relief or lessen the period of disability, including all care, diagnostics and treatment for his systemic allergic contact dermatitis.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded plaintiff in Paragraph 1 of this AWARD is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
4. Dr. Goldstein, Dr. Sherertz, and Dr. Bressler are authorized as plaintiff's treating physicians in all matters relating to his compensable disease of systemic allergic contact dermatitis.
5. Defendants shall pay the costs due this Commission.
This the ___ day of December, 2009.
S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/___________________ DIANNE C. SELLERS COMMISSIONER